# IN THE COURT OF APPEALS OF IOWA

No. 23-1893
Filed February 19, 2025

IN RE THE MARRIAGE OF KIMBERLY J. NELSON
AND AUSTIN T. NELSON

Upon the Petition of
KIMBERLY J. NELSON,
    Petitioner-Appellee/Cross-Appellant,

And Concerning
AUSTIN T. NELSON,
    Respondent-Appellant/Cross-Appellee.
_____

    Appeal from the Iowa District Court for Scott County, Jeffrey D. Bert, Judge.


    Austin Nelson appeals and Kimberly Nelson cross-appeals the decree dissolving their marriage. **AFFIRMED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**


    David N. Fautsch of Fautsch Tursi LLP, Des Moines, Jason R. Smith of The Weinhardt Law Firm, Des Moines, and Benjamin Arato of Wandro, Kanne & Lalor, P.C., Des Moines, for appellant/cross-appellee.

    Christopher B. Coppola and Jennifer H. De Kock of Coppola Hockenberg, P.C., West Des Moines, for appellee/cross-appellant.


    Heard by Tabor, C.J., and Schumacher and Chicchelly, JJ.

**SCHUMACHER, Judge.**

Austin Nelson appeals and Kimberly Nelson cross-appeals the decree dissolving their marriage. Austin claims the district court erred in its award of sole legal custody of the parties' two younger children to Kimberly, in its valuation of the parties' closely held business, in its award of the business to Kimberly, and in its denial of his discovery request of Kimberly's work-related emails. Kimberly claims the court erred by failing to award her retroactive child support, by failing to order that Austin provide a "new in box" iPhone for the two younger children, by failing to order Austin to reimburse her for the children's expenses within thirty days, by declining to credit her for fifty percent of Austin's "undisclosed" income, and by failing to order Austin to pay all expenses "required to complete the tax filings for 2022 forward." Upon our review, we affirm on appeal and affirm on cross-appeal.

## I. Background Facts and Proceedings

Austin and Kimberly married in 2006. They have three children, born in 2007, 2011, and 2013. Kimberly also has an older adult child. Neither brought significant assets to the marriage. Austin has a background in construction work, and Kimberly has management experience. In 2007, they formed 33 Carpenters Construction, Inc. ("33 Carpenters"), which developed into a successful roofing business specializing in "storm restoration and insurance claim work."[1] Additionally, over the years, the parties funneled earnings from 33 Carpenters

---

[1] Kimberly is the fifty-one percent majority owner of 33 Carpenters, and Austin owns the remaining forty-nine percent. As the district court observed, "The parties jointly agreed on this ownership structure with the hope of capitaliz[ing] on incentives offered to businesses that were primarily female owned."

toward real estate and formed four LLCs to purchase and hold income-producing properties.

Kimberly is responsible for the operations and systems of 33 Carpenters, and she supervises administrative staff. Initially, Kimberly generated all customer invoices. As the business grew, Kimberly required assistance with the invoicing. In late 2016, Austin developed an "Assignment of Claim and Benefits" form to address the company's growing concern with receivables. 33 Carpenters agents began using the form to assign homeowners' rights and benefits from insurers directly to 33 Carpenters. But in 2020, our supreme court found 33 Carpenters was "act[ing] as an unlicensed public adjuster" by its use of these forms and found its assignment contracts to be void and unenforceable. *See 33 Carpenters Constr., Inc. v. State Farm Life & Cas. Co.*, 939 N.W.2d 69, 72 (Iowa 2020); *see also 33 Carpenters Constr., Inc. v. IMT Ins. Co.*, 939 N.W.2d 95, 97 (Iowa 2020); *33 Carpenters Constr., Inc. v. Cincinnati Ins. Co.*, 939 N.W.2d 82, 84 (Iowa 2020). The district court noted that the supreme court's decision negatively affected 33 Carpenters's reputation. Meanwhile, the pandemic struck in early 2020, which also had an impact on profits. But two large storms that year (a hailstorm in April and a derecho in August) offset some deficits to 33 Carpenters's productivity.

Austin's struggle with alcoholism also fueled challenges for 33 Carpenters and the parties' marriage. Kimberly filed a petition for dissolution in early 2021, and Austin moved from the family home. In June, Austin transferred nearly $500,000 from a 33 Carpenters line of credit to his personal bank account. The district court filed an order freezing Austin's account, and Kimberly began managing 33 Carpenters on her own.

In July, following the hearing, the court entered an order on temporary matters, observing Austin had entered an inpatient substance-use program in Minnesota and allowing him visitation with the children via phone or video. The court entered another order on temporary matters in November, awarding temporary physical care of the children to Kimberly with supervised visitation to Austin. The court declined to order temporary child support, finding Kimberly "has substantial income at this time" and such an order "would be inequitable." The court further ordered Austin to "receive distributions equivalent to his ownership interests in the business when [Kimberly] receives such distributions equivalent to her ownership interests." In December 2022, the temporary order was modified to eliminate the requirement of supervised visitation for Austin.[2] By that time, the parties' oldest child was "completely alienated" from Austin and refused to see him.

After several years of contentious litigation, a dissolution trial took place over six days in April and May 2023. About three months before trial, the oldest child left Kimberly's home and began living with Austin. Kimberly was upset with the child's decision but believed it stemmed from her trying to enforce rules while Austin was more lenient. Kimberly requested sole legal custody of the children. Austin requested joint legal custody of the children, with Kimberly having physical care of the younger two children. He requested physical care of the oldest child.

Kimberly requested that the court award 33 Carpenters to her and restrain Austin from operating a competing roofing company in Iowa, Illinois, and Indiana—the three states in which 33 Carpenters conducted business. Austin offered to buy

---

[2] At trial, Austin testified he had been sober since June 2021, the date he checked himself into treatment.

33 Carpenters for $550,000, which Kimberly declined. Austin then requested that the court award the company to him, but if not, that the court order the company be sold and the proceeds split between the parties.

In the dissolution decree, the court ordered Kimberly to have physical care and sole legal custody of the two younger children. The parties were given joint legal custody of the oldest child, with physical care to Austin, with the court recognizing "the likelihood that [he] will change residences" again in the future and the fact that he "at age 16, has more say in choices related to his health, education and welfare." The court ordered Austin to pay child support of $1885.76 per month for the younger two children. No child support was ordered for the oldest child.[3]

The court observed the parties' experts presented "wildly differing opinions" on the value of 33 Carpenters. The parties agreed 33 Carpenters's profits had lowered drastically in recent years, but both blamed the other for its decreased performance. Ultimately, the court valued 33 Carpenters at $1,500,000 and awarded the business to Kimberly. The court declined to impose a noncompete clause against Austin. The court divided the parties' remaining assets and debts, awarding Austin most of the parties' other LLCs. Kimberly was ordered to make an equalization payment of $131,366.74 to Austin,[4] and the court declined Kimberly's requested attorney fees of $419,771.72.

Austin appeals and Kimberly cross-appeals.

---

[3] Neither party appeals the custodial order with respect to the oldest child.
[4] The district court initially ordered an equalization payment of $125,244.88. The court adjusted the amount in its ruling on the parties' rule 1.904(2) motions "[t]o account for transfer of [a] 529 educational account from Austin to Kim."

## II.     Standard of Review

We review dissolution-of-marriage actions de novo.  *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021).  Upon our review, "we examine the entire record and adjudicate anew the issue of the property distribution."  *In re Marriage of Towne*, 966 N.W.2d 668, 674 (Iowa Ct. App. 2021) (citation omitted).  We give weight to the findings of the district court, particularly about the credibility of witnesses, but we are not bound by them.  *Id.*  The district court is granted considerable latitude, and we will interfere in its rulings in dissolution matters only where there has been "a failure to do equity."  *In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022) (citation omitted).

## III.     Issues on Appeal

### A.     Legal Custody

Austin challenges the district court's award of sole legal custody of the parties' two younger children to Kimberly, arguing the court should have awarded the parties joint legal custody instead.  *Compare* Iowa Code § 598.1(5) (describing sole legal custody) (2021), *with id.* § 598.1(3) (defining joint legal custody).

"Legal custody carries with it certain rights and responsibilities, including but not limited to decision making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction."  *In re Marriage of Gensley*, 777 N.W.2d 705, 714 (Iowa Ct. App. 2009) (cleaned up).  "A parent who is awarded legal custody has the ability to participate in fundamental decisions about the child's life."  *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). If either parent asks the court for joint legal custody, a court must consider the factors set forth in Iowa Code section 598.41(3).  Those factors include:

a. Whether each parent would be a suitable custodian for the child.

b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.

c. Whether the parents can communicate with each other regarding the child's needs.

d. Whether both parents have actively cared for the child before and since the separation.

e. Whether each parent can support the other parent's relationship with the child.

. . . .

g. Whether one or both of the parents agree or are opposed to joint custody.

h. The geographic proximity of the parents.

i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.

j. Whether a history of domestic abuse, as defined in section 236.2, exists. In determining whether a history of domestic abuse exists, the court's consideration shall include but is not limited to commencement of an action pursuant to section 236.3, the issuance of a protective order against the parent . . . .

Iowa Code § 598.41(3). The children's best interests are the primary concern in determining a legal custody award. *Gensley*, 777 N.W.2d at 714.

These parties engaged in extensive litigation from March 2021, when Kimberly petitioned for dissolution, until the end of the dissolution trial in May 2023. Kimberly claimed Austin was mentally and verbally abusive and used alcohol and cocaine to the point he became inebriated, while Austin maintained Kimberly was manipulative and restricted his involvement with the children. Austin acknowledges he is an alcoholic, "albeit one with long periods of sobriety." At trial, Austin admitted he "got some [operating-while-intoxicated charges] early on" in the parties' marriage and there was a protective order in place between them around that time. Austin also acknowledged he incurred an OWI charge as recently as 2021. A temporary protective order between the parties was entered in June of

that year stemming from a conflict during which Austin threw a frying pan and damaged a wall.[5]

The parties agreed to have retired judge Gary McKenrick serve as a child and family reporter (CFR) on their case. *See* Iowa Code § 598.12B(2). McKenrick filed his report one week before the first day of trial and was called as a witness at trial. McKenrick reported:

> One of the principal issues of contention concerns whether there has been a history of domestic violence in the marriage. Based on the undersigned's investigation, no conclusion can be reached as to any history of domestic assaults. On the other hand, the undersigned is convinced that more likely than not [Austin] has been emotionally abusive toward [Kimberly] on repeated occasions during the marriage. Such abuse has been characterized by violent outbursts which have resulted in damage to property and generally have been related to [Austin's] intoxication.
>
> During the pendency of these proceedings, [Austin] voluntarily underwent extended inpatient substance abuse treatment. Also during the pendency of these proceedings, [Austin] has been arrested and convicted for OWI 2nd offense. [Austin] additionally has had adverse criminal consequences related to cocaine abuse. To his credit, [Austin] has had lengthy periods of time without apparent substance abuse, however it clearly is of a recurring nature. Based on my interviews with [Austin] and my experience as the initial presiding judicial officer over the Scott County Drug Court program, I conclude that [Austin] still has not recognized fully his addiction issues.

Related to the parties' ability to communicate and make parenting decisions, McKenrick further reported:

> During the course of the proceedings, [Kimberly] repeatedly has sought to limit and condition [Austin's] interaction with the children. Arguably, such actions may have been justified based on [Austin's] history of emotional abuse and his relapse into substance abuse, including the two relatively recent drunk driving convictions which he has had. She also unilaterally involved the children in counselling without [Austin's] input or involvement.

---

[5] Austin denied he threw the pan at Kimberly, who was in the room at the time. The district court later dissolved the temporary protective order.

On the other hand, [Austin] unilaterally intervened with school authorities concerning issues involving the oldest child. [Austin's] interaction with the counselling services being provided to the children appears to have been detrimental. Most telling, however, is [Austin's] conduct involving the provision of a vehicle for the oldest child. [Kimberly] sought to condition the child's obtaining his intermediate driver's license and a vehicle on adjustments to his behavior in relation to school and peers as well as compliance with household rules. [Austin] unilaterally procured a vehicle for the child's use and titled it in [Kimberly's] name, ostensibly to support [Kimberly's] ability to control the child's behavior. Yet, when [Kimberly] sought to discipline the child, [Austin] did not support such discipline, undermined [Kimberly's] parental authority, and assumed physical care of the child. Further, [Austin] has taken actions to relieve the child from the consequences of the motor vehicle collision in which the child was involved. I find these actions on the part of [Austin] to be extremely manipulative and deleterious to [Kimberly's] parental relationship with the oldest child.

. . . .

Given the inability of the parties to work together and jointly make important decisions concerning the children and support each other's parental role, as well as the factors underlying my recommendations concerning physical care, I do not believe that joint legal custody is in the best interest of the two youngest children. I simply do not believe the parties are capable of doing it. Again, if the Court were to grant joint legal custody, I believe the parties will regularly seek the Court's intervention to establish additional parameters every time they disagree, which I anticipate will be often. Therefore, my recommendation is that [Kimberly] be granted sole legal custody of the two youngest children.

Again, the situation with the oldest child is different and more problematic. While I do not believe the parties can effectuate joint legal custodial decision-making for the oldest child any more than for the two youngest children, it would be counter-productive and contrary to law to require legal custodial modification any time the oldest child has a falling out with one parent or the other. Therefore, I recommend that the Court award the parties joint legal custody of the oldest child with the provision that the parent with whom the child resides may exercise all the decision-making of a sole legal custodian during the child's residence with that parent.

Ultimately, the district court awarded the parties joint legal custody of the oldest child but awarded Kimberly sole legal custody of the younger two children. The court observed its decision "mirrors the recommendation of the CFR" but stated it

"reached this decision independently, and after thorough consideration of the evidence."

Austin challenges the court's order, questioning how the court could find the parties unable to coparent the younger children but able to coparent their teenage son. He claims the court's decision implies the court "did not meaningfully apply [the legal-custody] standard." Relating to the younger two children, Austin maintains Kimberly only "cited arguments on micro decisions." Austin also points out that the oldest child, "the child with a choice, chose to live with [him]."

The district court engaged in a thorough review of the evidence presented at trial, including testimony from the parties and other witnesses. The court specifically noted "[t]he tension and animosity between [Austin and Kimberly] are obvious"; "[n]either seeks to hide the distaste for the other." The court believed they were unable to "effectively communicate with each other about the needs of the younger children" or "put aside strong feelings to support [the children's] relationship with the other parent."[6] The court also noted Kimberly's history as the primary caregiver of the children. The district court further stated:

> In this case, the Court finds Kim credible in her claim of emotional abuse. While Kim was likely a willing participant in many arguments, there is little doubt that Austin has a temper. Austin's substance abuse issues fueled many of the arguments. Kim described Austin's behavior during the marriage as "extreme verbal and mental abuse in front of the children" or others with no regard "for anybody or anything." Having observed each party testify, as well as the clear animosity between them, and Kim's emotion while on the witness

---

[6] Austin disputes this finding, relying on McKenrick's statement that "[b]oth parties verbalized a desire to foster and support the other's relationship with each of the children." But we observe McKenrick continued, "[b]oth parties through their actions have done things that do not give confidence in either of their ability to do so."

stand, the Court finds clear and convincing evidence that these parties cannot effectively communicate with each other.

Ultimately, the court found the younger children's best interests would be best served by Kim having sole legal custody. In reaching this conclusion, the court relied in part on the parties' history of parenting the oldest child but acknowledged the reality that the oldest child "has learned how to manipulate the animosity between his parents to his own benefit and that it is likely that [he] will change residences before he reaches the age of majority," which compelled a split custody order under these circumstances. The court further stated:

> On June 11, 2021, the Court entered a Temporary Protective Order Ex Parte granting Kim exclusive possession of the marital residence and temporary custody of the children. Kim sought the protective order due to Austin's increasingly erratic and aggressive behavior. The entry of the protective order granted Kim temporary custody of the children. However, A.N. (age 16) now primarily resides with Austin. While Kim is not pleased with this decision, and is concerned about A.N.'s mental health, the reality of A.N.'s age (as recognized by the CFR) is that A.N., now that he can drive, has more control and input over his living situation. The relationship between A.N. and each of his parents is unsettled. The Court recognizes that although A.N. was living with Austin at the time of trial, that could change on a moment's notice, especially considering that A.N. appears to have elected to reside with Austin to avoid more strict rules at Kim's home.
>
> For these reasons, and others as explained below, the Court finds a split custody order is warranted. Although the Court's finding on legal custody mirrors the recommendation of the CFR, the Court has reached this decision independently, and after thorough consideration of the evidence. The Court awards sole legal custody of L.N. and E.N. to Kim. The Court awards the parties joint legal custody of A.N. Clear and convincing evidence exists that joint custody is unreasonable and not in the best interests of L.N. and E.N. However, the age of A.N. and his election to live with Austin support joint custody for him. A.N. is in high school and will be 18 in less than two years. . . . To award one parent sole legal custody of A.N., when A.N. will likely change residences before he reaches majority, would only invite further litigation between the parties.

The district court's evaluation of the section 598.41(3) factors was thorough, and its findings are supported by the record. While our review is de novo, "[w]e give weight to the findings of the district court, particularly concerning the credibility of witnesses." *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). Upon our review, we concur with the court's decision that granting sole legal custody of the younger two children to Kimberly is in the children's best interest. We affirm on this issue.

### B.    Valuation and Disposition of 33 Carpenters

Austin claims the court erred in its valuation of 33 Carpenters. He challenges the court's application of "the income approach exclusively to 'cash basis' financial statements"—an approach "[n]o party, or expert witness, suggested."

In a dissolution decree, "[t]he court shall divide all property, except inherited property or gifts received or expected by one party, equitably between the parties." Iowa Code § 598.21(5). Although we review the court's division of property de novo, we will only modify it on appeal "when there has been a failure to do equity." *In re Marriage of Kimbro*, 826 N.W.2d 696, 698 (Iowa 2013) (citation omitted). "Ordinarily, a trial court's valuation" of marriage property "will not be disturbed when it is within the range of permissible evidence," especially "when valuations are accompanied by supporting credibility findings or corroborating evidence." *Hansen*, 733 N.W.2d at 683.

At the outset, we observe the parties spent a significant amount of time during trial criticizing each other for harming the profitability of 33 Carpenters. The parties agree that 33 Carpenters was successful prior to 2020, but after that year,

profits fell dramatically. For the purposes of this appeal, however, the reasons behind the decline of 33 Carpenters are largely irrelevant.[7] We also note several points which we believe clarify the underlying volatility and uncertainty of the business. First, although Kimberly's expert valued 33 Carpenters at $275,950, Kimberly declined Austin's offer during trial to buy her share of 33 Carpenters for $550,000. On the flip side, Austin's expert valued 33 Carpenters at $3,600,000, yet Austin offered only $550,000 to buy Kimberly's share. Second, as it relates to the alleged value of 33 Carpenters's accounts receivable—which the parties agree is the business's largest asset—Austin's brief disregards in 2020, the supreme court determined 33 Carpenters's assignment contracts were void and unenforceable and in 2021, the Iowa Insurance Commissioner prohibited 33 Carpenters from acting as a public adjuster.[8] With that backdrop, we turn to the issues at hand.

Both parties presented expert testimony about the proper valuation of their closely held business. The experts relied on 33 Carpenters's accounting records and other financial information to prepare their reports.

Kimberly hired Brian Collier, a certified public accountant (CPA), to compile financial statements to determine the business's ending balance as of December 31, 2022. Collier noted the total receivables were "in excess of $4

---

[7] As noted below, in March 2023, Austin filed a shareholder derivative action raising accounting, breach-of-fiduciary-duty, and request-for-receivership claims against Kimberly. That action remained pending at the time the dissolution decree was entered.

[8] Austin testified to the positive impact the assignment contracts had on the profitability of 33 Carpenters, but he disregards the obvious change to 33 Carpenters's business model after 33 Carpenters discontinued that practice.

million," and the "past due amount was approximately $3.7 million." Collier testified, "I didn't go through and look at each individual item, but there were some that I saw from 2018 and 2017 or older, and there were significantly aged accounts that were in there." Collier stated after he began going through the files, he requested "the detail of the accounts receivable aging report" from Kimberly and "did the calculation for the allowance for doubtful accounts." Kimberly estimated 33 Carpenters to have a seventy-percent collection rate on those accounts "[b]ased on historical success rate, and then, also, taking into account the fees that would be taken by the collection agencies." Collier explained, "As we look at the value of the receivables, we have to take all of that into consideration." Collier arrived at a $2.95 million "bad debt" expense to complete his compilation. Collier acknowledged his "compilation doesn't provide an opinion that would be an audit," but "[i]t is in compliance with generally accepted accounting standards."

Another CPA, Shannon Shaw, performed a valuation of 33 Carpenters for Kimberly. Shaw relied in part on Collier's report for his analysis. Using the income approach, Shaw received a value of $275,950. Using the asset approach, with a marketability discount of twenty percent, Shaw found a value of $251,341. He felt confident in both approaches because "[t]here could be no issue of overreported receivables." In reaching these values, Shaw stated he believed the "book income" and "balance sheet equity" were "overstated for the years of 2018 through 2022." He also surmised the $2.95 million of "bad debt" in Collier's compilation "most certainly did not all occur in 2022. That number would have been an accumulation of bad debt going back to at least 2016, so over a period of years, not just 2022." According to Shaw, "I think it's significant that these accounts

receivables are fairly aged, and when you have aged receivables, the further out they go, the harder they are to collect, if at all, and if they were even to be able to be factored, the factoring discount rate would be significant."

Austin retained CPA Eric Engstrom to determine the fair market value of 33 Carpenters. Using the asset approach, which "is a minimum value for a company," Engstrom found "the value at the end of 2022 was about $3.6 million." Engstrom's opinion assumed the accounts receivable were one hundred percent collectible. Engstrom also created a rebuttal report after he reviewed Shaw's report. Engstrom focused on Shaw's determination using the income approach.[9] After several adjustments (including lowering Shaw's marketability discount to zero, not mixing profit measures between cash and accrual, and using a lower income-tax rate), Engstrom reached a value between $1.92 to $2.33 million for Shaw's valuation. He also explained "where companies are sold, then it's pretty normal for a business to take on some accounts receivable," but if the accounts receivable "was much higher than what the buyer would expect to have going forward," then the seller would keep them and "continue to try to collect on those receivables." Meanwhile, Shaw criticized Engstrom's opinion because Engstrom opined on financial statements "that he also feels they are unreliable," which according to Shaw, is "in significant violation of our standards."

Austin challenges the court's reliance on his expert's rebuttal report. He claims the court erred by placing the value of the accounts receivable at zero. But Engstrom testified his original report calculated the value of 33 Carpenters using

---

[9] Engstrom opined the income approach would not be reliable.

the asset approach, which "before the adjustment to accounts receivable had a balance of about $4.7 million" in 2021 and $3.6 million in 2022. The district court found Engstrom's "treatment of the receivables as 100% collectible is not realistic," and therefore "it is not credible." In any event, even based on Engstrom's report, when the accounts receivable are considered, Engstrom testified the value of 33 Carpenters would be "certainly more than fifty percent, maybe close to sixty percent" lower.

Ultimately, after evaluating the evidence presented and applying no growth rate but a twenty-percent marketability discount as suggested by Shaw,[10] the court determined "the fair market value of 100% of the company to be $1,500,000." The district court's valuation is well within the permissible range of evidence. Moreover, "we are mindful that given the difficulty of valuing a closely held business with any precision, 'the law provides much leeway to the trial court.'" *In re Marriage of Baedke*, No. 23-0219, 2024 WL 3688448, at *5 (Iowa Ct. App. Aug. 7, 2024) (quoting *In re Marriage of Steele*, 502 N.W.2d 18, 21 (Iowa Ct. App. 1993)). Considering the record presented, we decline to disturb the district court's valuation of the parties' closely held business.

Austin also challenges the court's decision to award 33 Carpenters to Kimberly rather than order it to be sold. According to Austin, "[s]elling 33 Carpenters would also avoid the need for mathematical gymnastics to equalize the parties' assets."

---

[10] "Applying the discount also tracks with Iowa precedent that has affirmed discounting the valuation of a closely held business or its stock in a property division when there is no ready market." *In re Marriage of Baedke*, No. 23-0219, 2024 WL 3688448, at *4 (Iowa Ct. App. Aug. 7, 2024) (collecting cases).

When reviewing the division of property "we accord the trial court considerable latitude in making this determination and will disturb the ruling only when there has been a failure to do equity." *In re Marriage of Okland*, 699 N.W.2d 260, 263 (Iowa 2005) (citation omitted). "An equitable distribution of marital property, based upon the factors in [section] 598.21(5), does not require an equal division of assets." *Kimbro*, 826 N.W.2d at 703. Equality is, however, often most equitable; therefore, we have repeatedly insisted on the equal or nearly equal division of marital assets. *Id.*

As Austin acknowledges, dissolution "forced sale" disputes in Iowa typically involve farmland. In those situations, the supreme court has realized "a forced sale is not a preferable method to divide marital assets, because such a sale tends to bring lower prices, and, as in this case, a party usually wants to keep the property rather than sell it." *McDermott*, 827 N.W.2d at 683. Rather, "[a]n equalization payment is preferable when the court cannot divide an asset easily and there are not enough liquid assets in the marital estate to achieve an equitable distribution." *Id.*

The district court found:

> [T]he company was started during the marriage and is a marital asset. In an effort to capitalize on benefits of being a female owned company, the parties allotted 51% of the membership units to Kim and 49% to Austin. As the company grew, Kim became more involved. Austin argues that the Court should disregard the ownership breakdown and treat his as an equal owner. The Court declines to do so. The parties made a joint decision to seek to capitalize on the benefits of being a female owned business. The Court will not ignore that decision now that it no longer serves any benefit to Austin. Decisions have consequences. But the decision to award the company to Kim is not based only on percentage of ownership.

> Kim has been running the company for the past two years. Key employees are loyal to Kim and would not work for Austin. Kim has primary physical care and custody of the two youngest children. Prior to starting 33 Carpenters with Austin, Kim worked in the food service industry. An award of the business to Austin, or a court ordered sale, would likely, at least in the short term, devastate Kim's ability to support herself and her children. This would not be in the best interests of E.N. and L.N. Kim has loyal employees in Bettendorf, Chicago and Indiana. Despite Austin's arguments otherwise, the company's income has stabilized in the last two years. In short, Kim would have a much more difficult time starting over than would Austin.

The testimony from Kimberly and several of her employees showed Kimberly wished to continue owning and managing 33 Carpenters "as she had done for many years." *See In re Marriage of Simon*, No. 14-0735, 2014 WL 7339335, at *4 (Iowa Ct. App. Dec. 24, 2014). In reaching its decision, the district court considered Kimberly's ability to do so, as well as her means "to provide an equalization payment to [Austin] to compensate him for his share of the assets." *Id.* In contrast, Austin maintained his ability to earn income in various capacities. As he testified, "I'm a partner in several highly profitable organizations." Indeed, the court "suspect[ed] Austin has been working and earning income during the pendency of this litigation" and had likely started another business to compete with 33 Carpenters. Along with the equalization payment, the court awarded Austin most of the parties' remaining LLCs and real estate. Upon our review, we find the division of marital property is equitable under the factors listed in Iowa Code section 598.21(5).

## C. Discovery of Work-Related Emails

Austin challenges the district court's April 2023 order denying him discovery of Kimberly's work-related emails. First, some background to this claim. As the

court observed, this "trial began with an exhibit dump." The electronic exhibit binder for this appeal includes nearly 8000 pages of documents. Trial was continued several times, and Austin filed multiple motions to compel. A hearing took place in September 2022 on one of Austin's motions to compel related to "documents that will show the financial health, or lack thereof, of 33 Carpenters." The court granted the motion and provided Kimberly twenty days to comply.

Kimberly filed responses, which Austin claimed were "incomplete." "[A]s a discovery sanction," Austin sought access to 33 Carpenters's "backup server," which was maintained by an external operator. In December, following a hearing, the district court granted Austin's request.

On March 30, 2023, Austin filed a fifth motion to compel, requesting in part "Austin Nelson's email account with 33 Carpenters," which had been "deactivated." According to Austin, "The email account contains numerous communications with 33 Carpenters attorneys that directly conflict with [Kimberly's] testimony, including her knowledge and/or receipt of legal advice regarding the use of assignments and appraisals . . . ." Austin requested that Kimberly "activate the account so that [his attorney] can obtain all of the emails." Under that same paragraph, the motion further stated, "Given the discrepancy between [Kimberly's] testimony and what we can already see to be true from these limited screenshots, she also must disclose her email account."

A hearing on pretrial motions, including the latest motion to compel, took place on April 4. Trial was scheduled to begin the following week. At the hearing, Austin's attorney argued that Kimberly's emails "are highly relevant to the case" to dispute her claims "regarding [Austin's] behavior, how it's impacted the business,

complaints she's received." Kimberly's attorney objected, and the following colloquy ensued:

> KIMBERLY'S ATTORNEY: [T]his has been a fishing expedition for months. They have more information than they could ever go through, and I would say, ninety-some percent of what they have been asking for and received is irrelevant. There are experts in this case. They have both done their reports, and I mean, what point would emails—hundreds of thousands of emails or tens of thousands, or whatever the number is—What in the world would that serve to divide assets in this case, because that's all this case is about, is dividing the assets.
>
> . . . .
>
> COURT [to Austin's attorney]: . . . How do the corporate emails impact the valuation of the businesses—business for purposes of equitably distributing the assets in a dissolution?
>
> AUSTIN'S ATTORNEY: . . . [T]his company used to make a lot of money by taking an assignment of claim of benefits from its customers. That assignment of claim of benefits allowed it to step into the shoes of the customer, negotiate directly with the insurance company and make a lot of money. Once Ms. Nelson forcibly removed Mr. Nelson from the business, she stopped doing that. In her deposition, she claims she had no idea this is what the assignment of claim of benefits was being used for, and she is being told now that it was wrong, that business practice, and she just had no idea where all of these millions of dollars were coming from. I have a very strong belief that those emails on her corporate account are going to show that she is not giving accurate testimony; that she was well aware of how the business was run. She is the president for goodness sakes so, of course, she knew how the business was being run and how they were making so much money.
>
> . . . .
>
> [T]his is an example where she is trying to blame my client for the devaluation of the business, and the emails are going to show that she was aware of the process all along, and she knew what was going on, and she was fine with it. Do you know why? Because they were making millions of dollars, and she decided to stop once she removed Mr. Nelson from the company, and now, low and behold, the company isn't doing so well, but she wants to blame my client for that as well. That's my point on discovery.

The district court denied Austin's motion, stating in relevant part:

> This dissolution has been pending since March 30, 2021. Trial is set to begin on April 11, 2023. It has been heavily contested since inception. Three minor children are involved. The Court

appointed a child and family reporter. The child and family reporter filed his Report on April 3, 2023. The parties are the only shareholders of 33 Carpenters, Inc. a business based in eastern Iowa. [Kimberly] has been running the business but [Austin] has had access to the company's backup server. *See Ruling on Motion to Compel filed December 8, 2022.* On March 31, 2023, Austin Nelson filed a civil lawsuit in Scott County against Kimberly Nelson directly related to 33 Carpenters Inc. and alleging Breach of Fiduciary Duty and requesting appointment of a receiver.

The children need certainty. Both parties reportedly have experts who have valued the business, with widely varying opinions. The law requires the Court to equitably divide the assets. The business is a going concern. [Austin] has now filed a separate action attacking [Kimberly]'s management of the business. In order to divide the assets, the Court will be required to value the business. Trial has already been continued from May 2022 to January 2023 to April 2023. The parties have conducted an extensive amount of discovery. The need to bring this matter to conclusion outweighs the need for further discovery and delay. The motion to continue is denied.

Prior to hearing, counsel for [Austin] admitted many of the issues in the motion to compel had been addressed. The remaining discovery sought by [Austin] was a profit and loss spreadsheet, documentation related to the purchase of Ford trucks and records of email correspondence. [Kimberly] agreed to provide the profit and loss spreadsheet and the documentation related to the purchase of the Ford trucks. [Kimberly] argues that production of emails is unduly burdensome. The Court notes the fifth motion for sanctions was filed March 30, 2023, simultaneously with the motion to continue and one day before [Austin] filed the civil lawsuit in LACE136021. [Austin] has had access to the backup server since December 2022.

At this late stage, the limited evidentiary value an email authored by [Kimberly] may have on the Court's determination of the value of the business does not outweigh the burden on [Austin] to comply or the additional damage to the children from a third trial continuance. The motion to compel is denied as to the email correspondence.

Reviewing courts have "consistently accorded the trial court broad discretion in superintending discovery." *Teig v. Chavez*, 8 N.W.3d 484, 490 (Iowa 2024) (cleaned up). Finding no abuse of discretion, we affirm the court's denial of

Austin's motion to compel related to Kimberly's work-related emails.[11]  *See id.* ("A district court's discovery rulings are reviewed for abuse of discretion.").

**IV.     Issues on Cross-Appeal**

**A.        Retroactive Child Support**

Kimberly challenges the district court's failure to order Austin to pay back child support beginning November 2021.  In the temporary order filed in November 2021, the court found Kimberly "has substantial income at this time and [it] would be inequitable to order temporary child support at this time."[12]  Kimberly now asks the court to "offset" her equalization payment "to provide [her] with a credit for back child support" in the amount of $33,943.68 for the period between November 2021 and May 2023 because "Austin had the capacity and actual earnings to pay child support" during that time.

"A temporary order setting child support is a final judgment that is appealable as a matter of right."  *In re Marriage of Curtis*, No. 18-1535, 2019

---

[11] We also observe the district court made specific findings in Austin's favor on the point Austin hoped to prove by the emails:

> Although Kim denied any knowledge of the use of an assignment of claim and benefits, the Court does not find Kim's denial to be credible.  As the person responsible for billing and collections, Kim certainly knew 33 Carpenters was using an assignment of benefit contract to reduce accounts receivable and give Austin the ability to deal directly with the insurance companies.

*See B&F Jacobson Lumber & Hardware, L.L.P. v. Acuity, a Mut. Ins. Co.*, No. 16-1134, 2017 WL 6513961, at *2 (Iowa Ct. App. Dec. 20, 2017) ("There must also be a showing that the alleged error [in a discovery ruling] resulted in prejudice to provide grounds for reversal.").

[12] As an aside, we observe the court reiterated its decision in its ruling on the parties' rule 1.904(2) motions: "During the pendency of the dissolution, Kim controlled 33 Carpenters.  Although Austin did not pay support during that time, the Court agrees that, based upon the evidence in the record, Kim was able to support herself and the children."

WL 3729275, at *6 (Iowa Ct. App. Aug. 7, 2019). At oral arguments, Kimberly argued that the district court specifically reserved the issue of child support. Her brief cites the November 5, 2021, temporary order. As noted, the court declined to order temporary support. The order also contained language reserving the issue of child support for final hearing. Austin asserts that Kimberly was required to appeal the temporary support order "within 30 days from the district court decision in order to preserve the right to contest [it]." *In re Marriage of Denly*, 590 N.W.2d 48, 50 (Iowa 1999).

We elect to assume without deciding that the district court's reservation of child support for final hearing preserved the issue of retroactive child support without an appeal of the temporary support order. In addressing the merits of the retroactive child support issue, we conclude it was equitable for the district court to order child support beginning June 1, 2023, rather than November 2021, as Kimberly was in control of the finances during the dissolution proceedings, including the parties' largest asset, 33 Carpenters. We decline to provide Kimberly with a credit against the equalization payment for retroactive child support.

## B. "New in Box" iPhone

Kimberly claims the district court erred by failing to order Austin to provide a "new in box" iPhone for the two younger children. According to Kimberly, she purchased an iPhone for the younger two children to share, but Austin failed to return it after visitation. Kimberly points to the decree: "Each party will be responsible for the children's clothes, electronics, and other belongings. The parties will ensure that anything brought from the other parent's house is returned with the children. *This includes [Austin] returning the phone purchased by*

*[Kimberly] for the minor children.*"  (Emphasis added.)  In her rule 1.904(2) motion,

Kimberly alleged:

> 23. The Court noted throughout the Decree that its intent was to reduce future occasions for litigation between the parties to the extent possible.  In furtherance of that intent, Kim requests that the Court set a timeline or date certain for each of the following acts to be completed by the parties:
> a. That Austin be ordered to send the children home with the mobile phone Kim purchased for the children, or its equivalent, following his next exercise of scheduled visitation, namely this coming Wednesday, September 27, 2023.  *See* 9/7/2023 Decree at 48.  Austin has informed Kim that he has purchased two (2) phones, one each for L.N. and E.N., for them to use at all times.  Given the ages of the minor children and the well-documented harm from social media and unfettered internet access, Kim as the primary parent and sole legal custodian does not consent to the younger children having their own phones.  Rather, Kim asks the Court to instruct Austin to comply with the Decree and either return the mobile phone Kim purchased for the children, or to purchase a new, equivalent phone and send it home with L.N. and E.N. still in its unopened packaging, so that she can install the necessary protective software and limitations to make the phone safe for their use.

Kimberly concedes Austin provided phones for the children, but she argues the phones are not identical to the one she provided.[13]  The issues of access to "social media" and "protective software" were not raised before the district court before Kimberly's motion.[14]  And the issues of "new in box," "carrier contracts," and "unlocked phones" were first raised in Kimberly's brief on appeal.  Accordingly, the variation of Kimberly's claim raised on appeal was not preserved for our review.

---

[13] After the decree was entered, Kimberly moved for contempt, acknowledging Austin sent her a "refurbished phone from Amazon" as a "replacement," but it was "without proper Apple accessories."

[14] Indeed, as Austin points out, at a contempt hearing in June 2022, Kimberly testified:
> He can buy them a phone.  It can sit at the house.  It'll be on from this time to this time, only used for phone call purposes with him, no one else.  I'll buy my own phone and send it when the kids are with him . . . .

*Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). In sum, we decline to modify the court's order on this point.

### C.     Reimbursement for Expenses

Kimberly claims the district court erred by failing to order Austin to reimburse her within thirty days "for the children's expenses ordered shared under the decree." Kimberly acknowledges the court ordered Austin to reimburse her "for certain of the children's expenses," but she claims the court erred because it "did not set a timeframe for reimbursement." But the court expressly set a thirty-day deadline for reimbursement of uncovered medical expenses:

> Kim, as the primary care parent for L.N and E.N., shall pay the first $250 per calendar year of uncovered medical expenses for the minor children L.N. and E.N. Thereafter, Kim shall pay 52% of the uncovered medical expenses for L.N. and E.N., and Austin shall pay 48% of the uncovered medical expenses for L.N. and E.N.
> Austin, as the primary care parent for A.N shall pay the first $250 per calendar year of uncovered medical expenses for the minor child, A.N. Thereafter, Austin shall pay 48% of the uncovered medical expenses for A.N., and Kim shall pay 52% of A.N.'s uncovered medical expenses.
> . . . .
> . . . The nonpaying party shall reimburse the other parent for their share of the uncovered medical expense within thirty (30) days of the receipt of a copy of the bill and notification of the amount due and owing. Failure of the party incurring the expense to submit the expense to the other party within thirty (30) days of receiving the bill constitutes a waiver the paying parent to seek reimbursement from the nonpaying parent for said expense.

The only other expense for the children that the district court ordered the parties to share relates to the oldest child. The court ordered: "As to A.N., each party shall pay 50% of his school and extracurricular expenses." In her reply brief, Kimberly

claims, "This Court should also set a deadline of 30 days for the parties to reimburse each other for expenses incurred on behalf of A.N., the eldest child, expenses ordered shared under the Decree."

Generally, we do not consider issues raised by a party for the first time in a reply brief. *In re Marriage of Ficken*, 989 N.W.2d 669, 675 n.6 (Iowa Ct. App. 2023). Here, however, we find A.N.'s school and extracurricular expenses fit in Kimberly's initial claim of "children's expenses." Yet Kimberly did not raise her request to the district court at trial or in her rule 1.904(2) motion. We decline to modify the decree on this issue.

### D.     Austin's "Undisclosed" Income

Kimberly claims the court erred by declining to credit her for fifty percent of Austin's undisclosed income. This issue—which is more appropriately characterized as Austin's additional income—was first discussed at the hearing on temporary matters in October 2021.

During that hearing, the parties agreed they were each being paid "the same amount in salary [from 33 Carpenters]. $6750 a month pretax." Historically, the parties had also taken distributions from the company in addition to their salaries. Still, Austin testified he had "received no distributions since January—in 2021," whereas Kimberly had received numerous, large distributions.[15] Austin requested the court to "provide [him] with distributions in equivalent amounts to what

---

[15] The district court later found Austin "failed to meet his burden of proof on this issue." Yet we observe that Kimberly agreed she had taken a number of large distributions during those months to pay for various expenses.

[Kimberly] has taken so far from the company since the divorce has been pending."

As for any other source of income he had, Austin testified:

> [L]ate last year, early on, I provided some appraisal services for a public adjustor. I left those proceeds [$10,500] at the office because as I have always done 100% of my money goes into our joint accounts. . . .[16]
> I additionally provided consulting services for a company called Hawkeye [Flatz]. They did a project for Midwest Motor Express in Cedar Rapids, Iowa. And I received approximately $65,000. That was less than two months ago, maybe about a month ago, that I had paid to my brother because I have not had access to any money from our joint funds. And so he had got $65,000 of my money that I am not touching yet because I can't afford to pay my attorney. I can't afford to pay for anything. I have to think about whether I can put diesel fuel in my truck.

Austin later explained he gave the money to his brother because Kimberly "froze [him] out" and he "didn't have money." In short, Austin stated, "I need temporary support."

Kimberly admitted she had received distributions from 33 Carpenters whereas Austin had not. But Kimberly stated she had used the distributions to pay for all the parties' joint expenses (including all bills and living expenses associated with the marital home and the children) since Austin moved out in April. Kimberly testified she had also paid $10,000 toward Austin's attorney fees; $25,000 toward Austin's inpatient treatment; and $6000 toward Austin's rental payments for his apartment "because he never set up the payments" "while he was in rehab."

When asked if she would provide Austin "with his forty-nine percent distributions from the company," Kimberly responded, "My attorneys will deal with all of that"; "[h]e has a paycheck." But she admitted the distributions were the

---

[16] Austin later acknowledged he was "able to pick it up physically and take it out of the office."

parties' "joint assets." The district court's November 2021 order[17] on temporary matters addressed the issue:

> [Austin] shall receive distributions equivalent to his ownership interests in the businesses when [Kimberly] receives such distributions equivalent to her ownership interests for the date of this Order forward. The Court determines any Order addressing alleged distributions taken by [Kimberly] during the pendency of this matter is a property division at this time and must be addressed in the final hearing or stipulation entered between the parties.

On appeal, Kimberly challenges the district court's failure to "grant her an equitable share, or fifty (50%) percent of Austin's admitted earnings of $76,350.00 from Hawkeye Flatz and the appraisals" that Austin earned before the court's November 2021 order. Kimberly "requests that this Court apply the $38,175.00 as a credit to offset the equalization payment." Austin counters, "There is no mystery where this money went. [He] testified that he initially gave the money to his brother, and later spent it on expenses." Austin further states, "if [he] had not spent the consulting and appraisal funds on expenses, he would have spent other funds, decreasing marital assets just as much." Under these facts, we decline to disturb the court's order declining to credit Kimberly with credit for half of the challenged income. We affirm on this issue.

### E. Expenses for Tax Filings

Finally, Kimberly claims this court "should modify the decree to order Austin to pay all penalties, late fees or other expenses, including but not limited to

---

[17] In the decree, the district court stated, "Austin has not been involved in the day-to-day operation of 33 Carpenters since June of 2021, but has received distributions equal to those of Kim since that time." To clarify, the district court ordered the parties to receive equal distributions starting in November 2021. Prior to that time, Austin was receiving "his regular monthly salary," while Kimberly was receiving her regular monthly salary plus distributions.

additional accounting fees, required to complete the tax filings for 2022 forward."

Because this issue was neither raised nor addressed by the district court,[18] we decline to address it on appeal. *Meier*, 641 N.W.2d at 537.

## V.    Conclusion

Having addressed the issues raised in the parties' respective appeal and cross-appeal, we affirm the dissolution decree entered by the district court. We decline to award appellate attorney fees.

**AFFIRMED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

---

[18] The only mention of a similar issue is contained in the court's ruling on the parties' rule 1.904(2) motions, in which the court stated, "As to the dispute regarding tax returns, the Court understands the parties resolved that issue after oral argument on the motions to reconsider and that no Ruling is required on that issue."